**FILED**
CLERK, U.S. DISTRICT COURT

6/27/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jb _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>CHASE CARRILLO,<br>  aka "Sicko,"<br>RONNY ROJAS,<br>  aka "Ronald Rojas,"<br>  aka "Rowdy,"<br>MARIA GARCIA,<br>  aka "Riah,"<br>  aka "Bubba,"<br>RAPHAEL SOLORZANO<br>  aka "Snoops,"<br>RICHARD GUZMAN,<br>  aka "Psycho," and<br>DANIEL SAXELL,<br>  aka "Blanco,"<br><br>      Defendants. | CR 22-573(A)-FWS<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. §§ 1959(a)(1), (a)(5): Violent Crime in Aid of Racketeering; 18 U.S.C. § 924(c)(1)(A)(iii),(j)(1): Using, Carrying, Possessing, and Discharging Firearms in Furtherance of, and During and in Relation to, a Crime of Violence, Resulting in Death; 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(viii): Distribution and Possession with Intent to Distribute Controlled Substances; 18 U.S.C. §§ 981(a)(1)(C), 924(d), and 1963, 21 U.S.C. § 853, and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

GENERAL ALLEGATIONS

A.   THE RACKETEERING ENTERPRISE

1.   At times relevant to this First Superseding Indictment, defendants CHASE CARRILLO, also known as ("aka") "Sicko," RAPHAEL SOLORZANO, aka "Snoops," and RICHARD GUZMAN, aka "Psycho," and others known and unknown to the Grand Jury, were members and associates of the Quiet Village street gang (hereinafter referred to as "QV"), a criminal organization operating in and around Los Angeles, California, whose members and associates engaged in, among other things, numerous acts of violence and other crimes, including acts involving murder, witness intimidation, illegal gambling, fraud, and trafficking in narcotics.   QV operated within the Central District of California.

2.   QV, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce.   QV constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

B.   BACKGROUND OF THE RACKETEERING ENTERPRISE

3.   QV was a multi-generational Hispanic street gang that originated in the 1940s and was founded on the westside of Whittier, California.   QV was formed, in part, so that its members could protect themselves from local rival gangs.   The founding members of QV were originally from the Jim Town street gang, with whom they shared a border (Whittier Boulevard).   QV had over 40 members.

2

4.   QV claimed territory on the westside of Whittier with its borders of Whittier Boulevard to the north, Mines Boulevard to the south, the San Gabriel River to the west, and Broadway Avenue to the east.  QV marked its territory by spray painting, or tagging, to demonstrate control over its territory.  QV members used numbers and letters for their gang, such as "QV" and "Quiet Village."  QV members also tagged the letters of rival gangs and then crossed them out, in a show of disrespect to that rival.  Such cross-out tagging was also used as a challenge to those rival gang members and to communicate among members.  Additionally, QV members tagged in its claimed territory to warn or instill fear in the community.

5.   QV also murdered police officers and celebrated such murders within the gang.  For example, on or about June 14, 2022, a QV member murdered two on-duty police officers who were conducting a wellness check related to a potential domestic violence incident in a city neighboring QV territory.  QV memorialized the murderer, whose gang moniker was "Stretch," by posting pictures of him and tagging his gang moniker throughout QV territory in order to enhance QV's reputation for violence, instill fear in the community, and control QV territory.

6.   QV had an alliance with Whittier Varrio Locos, another criminal street gang located in Whittier, California.  QV had several violent rival gangs throughout Whittier, most prominently the Jim Town gang, Dead End Locos gang, and Canta Rañas.  In ongoing efforts to assert dominance and control over its territory, QV members engaged in violence against rivals and those perceived to be rival gang members.

3

7.   QV was associated with the Mexican Mafia, commonly referred to as "la Eme" (which translates in English to "the M").  The Mexican Mafia was a criminal organization that operated within the California state prison system, the federal prison system, and the streets and suburbs of large cities throughout Southern California.  By controlling the criminal activities occurring within prison facilities, providing protection for imprisoned members and associates of Hispanic gangs, and imposing discipline, often in the form of acts of violence, against both individuals and street gangs that fail to adhere to its directives, the Mexican Mafia rose to the position where it exercised control over Hispanic street gangs operating throughout the southern half of the State of California. Specifically, its individual members controlled one or more Hispanic street gangs, which served as the power base through which the Mexican Mafia members operated their individual criminal organizations.  In return for its integration into the Mexican Mafia, as well as payment of rent or "taxes" to the Mexican Mafia, QV members received the Mexican Mafia's protection in the neighborhoods and in prison.

8.   QV had a shot caller, a person responsible for overseeing QV's activities.  QV's shot caller was also responsible for collecting extortionate taxes from anyone generating money through illegal activity in its territory, as well as remitting QV's taxes to the Mexican Mafia member who controlled QV.

9.   QV trended toward using the Internet and social media to communicate its gang affiliation, unlike past means of doing so, including tagging, tattoos, and distinctive clothing.  QV recruited, communicated, and issued threats via social media platforms and video

4

communication platforms, including Facebook, Instagram, YouTube, and Facetime.  QV typically used the hashtag #1722, "1722," due to "Q" being the seventeenth letter of the alphabet and "V" being the twenty-second letter of the alphabet.  In this way, QV members could identify as QV, mark their territories, disrespect rivals, including by going to a rival gang's territory and posting videos throwing QV gang signs, and alert fellow members to the presence of law enforcement or rivals.

10.  As sources of revenue, QV members and associates trafficked narcotics; committed fraud; and managed an illegal gambling operation.

11.  QV members and associates, to instill fear in the community and protect its turf, committed acts of violence, including acts involving murder, witness intimidation, and assault.  To exact revenge in rival gang territory, QV members and associates engaged in shootings.  QV members and associates also committed shootings of rival gang members, sometimes in retaliation for murders of QV members by rivals, sometimes to assert QV's dominance.  Shootings by QV members maintained and increased position in QV.

12.  QV used a number of common signs and symbols.  As a hand sign, QV members used the "QV" hand sign.  This was most commonly displayed by placing the thumb and index finger together forming a circle, while the three remaining fingers were extended, forming a "V."  QV members also used the widely recognized symbol for telling someone to be quiet, by placing their index finger facing straight up, over the middle of their mouth.

C.   PURPOSES OF THE ENTERPRISE

13.   The purposes of the QV enterprise included, but were not limited to, the following:

a.   Enriching members and associates of QV through, among other things, the control of, and participation in, the trafficking of controlled substances in QV territory; through fraud; and through an illegal gambling operation;

b.   Maintaining control over all QV territory;

c.   Preserving, protecting, and expanding the power of QV through the use of intimidation, violence, and threats of violence; and

d.   Violently retaliating against rival gang members, perceived outsiders, or law enforcement who challenged QV authority or attempted to encroach on QV territory.

D.   THE MEANS AND METHODS OF THE ENTERPRISE

14.   The means and methods by which members and associates of QV conducted and participated in the conduct of the affairs of the QV criminal enterprise included the following:

a.   Members and associates of QV committed, attempted to commit, conspired to commit, and threatened to commit acts of violence, including acts involving murder and witness intimidation, to preserve, protect, and expand QV's criminal operations;

b.   Members and associates of QV promoted a climate of fear through acts of violence and threats to commit acts of violence;

c.   Leaders of QV disseminated rules and orders to be followed by all participants in the QV enterprise; and

1            d.   Members and associates of QV engaged in the

2   trafficking of controlled substances, committed fraud, and managed an

3   illegal gambling operation.

COUNT ONE

[18 U.S.C. § 1962(d)]

[DEFENDANTS CARRILLO, SOLORZANO, and GUZMAN]

1.    Paragraphs 1 through 13 of the General Allegations are re-alleged and incorporated here.

A.    OBJECT OF THE CONSPIRACY

2.    Beginning on a date unknown, and continuing to on or about June 27, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendants CARRILLO, SOLORZANO, and GUZMAN, and others known and unknown to the Grand Jury, being persons employed by and associated with QV, an enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple:

     a.    Acts involving murder, in violation of California Penal Code Sections 31, 182, 187, 189, and 664;

     b.    Acts indictable under Title 18, United States Code, Section 1512 (relating to tampering with a witness, victim, or informant);

     c.    Acts indictable under Title 18, United States Code, Section 1513 (relating to retaliating against a witness, victim, or informant);

8

1        d.   Offenses involving trafficking in controlled

2 substances, in violation of Title 21, United States Code, Sections

3 841(a)(1) and 846;

4        e.   Acts indictable under Title 18, United States Code,

5 Section 1343 (related to wire fraud);

6        f.   Acts indictable under Title 18, United States Code,

7 Section 1344 (related to financial institutions fraud);

8        g.   Acts indictable under Title 18, United States Code

9 Sections 1953 (relating to interstate transportation of wagering

10 paraphernalia);

11    3.   It was a further part of the conspiracy that each defendant

12 agreed that a conspirator would commit at least two acts of

13 racketeering in the conduct of the affairs of the enterprise.

14 B.   <u>MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE</u>

15    <u>ACCOMPLISHED</u>

16    4.   The object of the conspiracy was to be accomplished, in

17 substance, as follows:

18        a.   Defendant CARRILLO and others, including members of

19 allied gangs, would commit shootings against members of rival gangs

20 to maintain the status of QV and to maintain their individual

21 statuses within QV.

22        b.   Defendant CARRILLO would attempt to murder those who

23 witnessed such shootings and cooperated with law enforcement, and

24 would in fact murder bystanders.

25        c.   Defendants GUZMAN and SOLORZANO would participate in

26 the operation of an illegal gambling business to bring revenue to QV.

27        d.   Defendant GUZMAN would sell drugs at the illegal

28 gambling business to bring revenue to QV.

1          e.   Defendant SOLORZANO would possess firearms and

2  controlled substances with the intent to distribute the controlled

3  substances.

4          f.   Defendant CARRILLO would commit fraud related to the

5  activities of QV.

6  C.   OVERT ACTS

7          5.   In furtherance of the conspiracy and to accomplish the

8  object and purposes of the conspiracy, on or about the following

9  dates, defendants CARRILLO, SOLORZANO, and GUZMAN, and other members

10  and associates of QV, committed and caused to be committed various

11  overt acts within the Central District of California, and elsewhere,

12  including, but not limited to, the following:

13      Overt Act No. 1:   On June 19, 2012, defendant SOLORZANO

14  possessed methamphetamine for sale and a loaded 9 mm semi-automatic

15  Ruger handgun.

16      Overt Act No. 2:   On September 20, 2014, while in state

17  prison, in the custody of the California Department of Corrections

18  and Rehabilitation, defendant CARRILLO violently assaulted two

19  California Corrections Officers.

20      Overt Act No. 3:   On January 13, 2022, defendant CARRILLO

21  engaged in a verbal altercation with victim J.R., who was a member of

22  the rival Dead End Locos street gang, and demanded to know the gang

23  to which victim J.R. belonged.

24      Overt Act No. 4:   On January 13, 2022, after Co-Conspirator

25  Maria Garcia, a member of the Whittier Varrio Locos ("WVL"), a street

26  gang with a close alliance with QV, observed the altercation between

27  defendant CARRILLO and victim J.R., Garcia walked to a nearby vehicle

28  in which Co-Conspirator Ronny Rojas, also a member of WVL; a QV

associate; and J.P. were waiting, and asked for someone to support defendant CARRILLO in the altercation.

Overt Act No. 5:   On January 13, 2022, Rojas responded to Garcia's request by joining defendant CARRILLO in the altercation with victim J.R.

Overt Act No. 6:   On January 13, 2022, Rojas pistol-whipped victim J.R.

Overt Act No. 7:   On January 13, 2022, defendant CARRILLO and Rojas discharged their respective firearms at victim J.R., striking victim J.R. approximately eight to ten times and severely wounding him.

Overt Act No. 8:   On January 13, 2022, after the violent confrontation with victim J.R., defendant CARRILLO, Rojas, and Garcia returned to the vehicle, where a QV associate and J.P. were waiting, to escape from the scene of the shooting, and someone ordered J.P. to drive the vehicle.

Overt Act No. 9:   On March 2, 2022, Garcia entered the vehicle of victim D.O. without permission and stole victim D.O.'s wallet, phone, and credit card.

Overt Act No. 10:   On March 3, 2022, Garcia had a recorded jail call with Co-Conspirator One in which Garcia said, "I came up fat as fuck yesterday like $7,120 . . .  I was in San Bernardino . . .  I picked the right car to go through . . .  I went through . . .  Rowdy is getting $50.  There was a badass Galaxy in the car and I got his wallet.  He had his credit card.  I don't know I wasn't even thinking about the pin . . .  I wonder what the fucking pin is, let me try his fucking birthday and I tried his birthday and it went through."

1      <u>Overt Act No. 11:</u>   On March 3, 2022, Rojas made a recorded jail
2  call during which Rojas told Garcia that Rojas would send Garcia a
3  copy of a police report detailing J.P.'s statements to law
4  enforcement about the attempted murder of J.R. (the "paperwork"),
5  which paperwork identified Rojas, Garcia, and Defendant CARRILLO as
6  people present at the attempted murder.

7      <u>Overt Act No. 12:</u>   On March 3, 2022, during the same jail call,
8  Rojas called J.P. a "straight bitch"; Garcia said, "like I just wanna
9  go fucking like . . ." and Rojas interrupted and said, "Like straight
10 bitch him"; Garcia replied "Oh my God, I just . . . I'mma do this
11 myself.  I'mma do this myself," indicating that she wanted to murder
12 J.P. herself.

13     <u>Overt Act No. 13:</u>   On March 3, 2022, Rojas directed Attorney
14 One, who was representing Rojas regarding the attempted murder of
15 J.R., to give Garcia the paperwork, and Attorney One did so that same
16 day.

17     <u>Overt Act No. 14:</u>   On March 3, 2022, Rojas again spoke to
18 Garcia, who confirmed that she had begun reading the paperwork and
19 said that she was "fucking mad, it's crazy as fuck."

20     <u>Overt Act No. 15:</u>   On March 3, 2022, Rojas also told his mother
21 that he gave Garcia the paperwork "to get to all the homies. You know
22 what I mean," which meant that Garcia should distribute the paperwork
23 to fellow gang members to indicate that J.P. should be murdered for
24 cooperating with law enforcement.

25     <u>Overt Act No. 16:</u>   On March 3, 2022, Garcia gave the paperwork
26 to Rojas's mother.

27     <u>Overt Act No. 17:</u>   Between March 3 and March 5, 2022, Garcia
28 gave the paperwork to defendant CARRILLO.

<u>Overt Act No. 18:</u>   Between March 3, 2022, and March 5, 2022, Garcia told Richard Torres, a member of WVL, that J.P. was on paperwork and gave Torres the paperwork to distribute to other WVL members.

<u>Overt Act No. 19:</u>   Between March 3, 2022, and March 7, 2022, Richard Torres distributed the paperwork to other WVL members.

<u>Overt Act No. 20:</u>   On March 4, 2022, defendant CARRILLO used D.O.'s stolen credit card to rent a White 2019 Chrysler 300 (the "Chrysler".)

<u>Overt Act No. 21:</u>   On March 5, 2022, defendant CARRILLO and Garcia drove to the intersection of Telegraph Road and Garfield Avenue in Commerce, California.

<u>Overt Act No. 22:</u>   On March 5, 2022, defendant CARRILLO, intending to murder victim J.P., got out of the Chrysler and fired at least two rounds into the cabin of the Ford, striking and killing victim M.F., who was driving the Ford.

<u>Overt Act No. 23:</u>   Between sometime after March 5, 2022, and continuing through July of 2022, in order to evade law enforcement's investigation into the attempted murder of victim J.P. and murder of M.F., Garcia fled Los Angeles County to Kansas City, Kansas, where she stayed at the home of defendant SOLORZANO.

<u>Overt Act No. 24:</u>   On March 6, 2022, defendant Rojas told defendant CARRILLO by phone, "the only thing that's fucking gonna hold us back is fucking, hold me back is fucking you know what I mean, fucking Thief," referring to victim J.P.'s moniker.

<u>Overt Act No. 25:</u>   Between March 6, 2022, and March 9, 2022, Garcia repeatedly tried to sell a firearm that defendant CARRILLO used to kill victim M.F., writing over Facebook messenger

solicitations to friends such as "Do you or anybody you know want to buy a ghost gun. Its a 9mm ghost gun with a 30 round clip;" and "I need to get rid of this strap that i got.. Its a 9mm ghost gun and it has a 30round clil."

Overt Act No. 26:   On March 7, 2022, Garcia had a conversation over Facebook messenger with WVL Member Two in which WVL Member Two sent Garcia the paperwork and inquired why she was named in it and Garcia responded by asking, "how did you get that? I got the copies," meaning that Garcia had originally received the paperwork from Rojas.

Overt Act No. 27:   On March 12, 2022, a co-conspirator called Garcia and asked if Garcia knew what happened to victim M.F., Garcia responded, "yeah she was driving his car" and later said, "sometimes you gotta take matters into your own hands, you know?" indicating that Garcia had helped attempt to murder J.P.; Garcia further explained, "I had the paperwork, and I didn't ask anybody you know. I already knew what had to be done because Rowdy [referring to defendant Rojas] was already busted and you know, my name was in there too.  He said my name," which meant that Garcia helped attempt to murder victim J.P. as retaliation for victim J.P. naming Rojas and Garcia as people involved in attempting to murder victim J.R.

Overt Act No. 28:   On March 12, 2022, Garcia told a co-conspirator in reference to the murder of victim M.F. and attempted murder of J.P., "The next day I seen him on the boulevard and, I saw him three different times, I, I was following him on the boulevard and, and I fucking, somehow, I missed him.  They [M.F. and J.P.] played musical chairs and . . . he [J.P.] ended up being the passenger."

Overt Act No. 29:   Beginning on a date unknown and continuing until at least November 16, 2022, QV co-conspirators operated an illegal gambling business in Whittier, California, in which QV sold drugs, stored firearms, and displayed gang tags and posters to advance QV's reputation for violence and intimidate others.

Overt Act No. 30:   Beginning on June 14, 2022, after QV member "Stretch" murdered two El Monte police officers, QV members placed posters, stickers, and graffiti at QV's illegal gambling business and elsewhere to celebrate the actions of "Stretch" and in order to advance their gang's reputation for violence and intimidate others.

Overt Act No. 31:   On July 8, 2022, at the QV illegal gambling business, while supervising the operation of the business, defendant GUZMAN sold approximately 13.8 grams of methamphetamine to Confidential Informant One ("CI One"), an individual defendant GUZMAN believed was a drug customer but who was actually a confidential informant working with law enforcement.

Overt Act No. 32:   On July 13, 2022, at the QV illegal gambling business, while conducting the business, defendant GUZMAN sold approximately 3.45 grams of methamphetamine to CI One.

Overt Act No. 33:   On July 15, 2022, at the QV illegal gambling business, while conducting the business, defendant GUZMAN sold approximately 54 grams of methamphetamine to CI One.

Overt Act No. 34:   On July 28, 2022, at the QV illegal gambling business, while conducting the business, defendant GUZMAN sold approximately 23.2 grams of methamphetamine to CI One.

1      <u>Overt Act No. 35:</u>   On August 12, 2022, at the QV illegal
2  gambling business, while conducting the business, defendant GUZMAN
3  sold approximately 55.3 grams of methamphetamine to CI One.

4      <u>Overt Act No. 36:</u>   Beginning on a date unknown but no later
5  than September 27, 2022, and continuing until at least on or about
6  November 16, 2022, a co-conspirator managed QV's illegal gambling
7  business, among other things maintaining a ledger book for the
8  business, and holding approximately $1,520 in the business's cash.

9      <u>Overt Act No. 37:</u>   Beginning on November 19, 2022, defendant
10 SOLORZANO drove approximately seven pounds of a mixture and substance
11 containing methamphetamine from Kansas to the home of an individual
12 in La Puente, California, intending to sell it.

13     <u>Overt Act No. 38:</u>   Beginning on November 19, 2022, defendant
14 SOLORZANO drove a gambling machine from Kansas to La Puente,
15 California, intending it to be used in QV's illegal gambling
16 business.

17
18
19
20
21
22
23
24
25
26
27
28

COUNT TWO

[18 U.S.C. §§ 1959(a)(5), 2(a)]

[DEFENDANT CARRILLO]

1.    At times relevant to this First Superseding Indictment, QV, as described more particularly in paragraphs 1 through 13 of the General Allegations, which paragraphs are re-alleged and incorporated here, including its leaders, members, and associates, constituted an enterprise, as that term is defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

2.    At times relevant to this First Superseding Indictment, QV, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is:

a.    Acts involving murder, in violation of California Penal Code Sections 31, 182, 187, 189, and 664;

b.    Offenses involving trafficking in controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846;

3.    On or about January 13, 2022, in Los Angeles County, within the Central District of California, for the purpose of gaining entrance to and maintaining and increasing position in QV, an enterprise engaged in racketeering activity, defendant CARRILLO, and others known and unknown to the Grand Jury, each aiding and abetting

the other, attempted to murder victim J.R., in violation of California Penal Code Sections 31, 187, 189, and 664.

COUNT THREE

[18 U.S.C. §§ 924(c)(1)(A)(iii), 2(a)]

[DEFENDANT CARRILLO]

On or about January 13, 2022, in Los Angeles County, within the Central District of California, defendant CHASE CARRILLO, also known as "Sicko," and others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly used and carried a firearm during and in relation to, and possessed the firearm in furtherance of, a crime of violence, namely, Violent Crime in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(5), as charged in Count Two of this First Superseding Indictment, and in so doing, discharged the firearm.

COUNT FOUR

[18 U.S.C. §§ 1959(a)(5), 2(a)]

[DEFENDANT CARRILLO]

1.    Paragraphs 1 through 13 of the General Allegations and Paragraphs 1 and 2 of Count Two of this First Superseding Indictment are re-alleged and incorporated here.

2.    On or about March 5, 2022, in Los Angeles County, within the Central District of California, for the purpose of gaining entrance to and maintaining and increasing position in QV, an enterprise engaged in racketeering activity, defendant CHASE CARRILLO, also known as "Sicko," and others known and unknown to the Grand Jury, each aiding and abetting the other, unlawfully and knowingly attempted to murder victim J.P., in violation of California Penal Code Sections 31, 187, 189, and 664.

COUNT FIVE

[18 U.S.C. §§ 1959(a)(1), 2(a)]

[DEFENDANT CARRILLO]

1.    Paragraphs 1 through 13 of the General Allegations and Paragraphs 1 and 2 of Count Two of this First Superseding Indictment are re-alleged and incorporated here.

2.    On or about March 5, 2022, in Los Angeles County, within the Central District of California, for the purpose of gaining entrance to and maintaining and increasing position in QV, an enterprise engaged in racketeering activity, defendant CHASE CARRILLO, also known as "Sicko," and others known and unknown to the Grand Jury, each aiding and abetting the other, unlawfully and knowingly murdered victim M.F., in violation of California Penal Code Sections 31, 187, and 189.

COUNT SIX

[18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1), 2(a)]

[DEFENDANT CARRILLO]

1.    On or about March 5, 2022, in Los Angeles County, within the Central District of California, defendant CHASE CARRILLO, also known as "Sicko," and others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly used and carried a firearm during and in relation to, and possessed the firearm in furtherance of, a crime of violence, namely, Murder in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(1), as charged in Count Five of this First Superseding Indictment, and in so doing, discharged the firearm.

2.    In the course of discharging this firearm, and through the use of this firearm, defendant CARRILLO, and others known and unknown to the Grand Jury, each aiding and abetting the other, caused the death of victim M.F., a death that constituted a murder, as defined in Title 18, United States Code, Section 1111(a).

COUNT SEVEN

[18 U.S.C. §§ 1959(a)(5), 2(a)]

[DEFENDANT ROJAS]

A.   THE RACKETEERING ENTERPRISE

At times relevant to this First Superseding Indictment:

1.   Defendant RONNY ROJAS, also known as ("aka") "Ronald Rojas," aka "Rowdy," and others known and unknown to the Grand Jury, were members and associates of the Whittier Varrio Locos street gang (hereinafter referred to as "WVL"), a criminal organization operating in and around Los Angeles, California, whose members and associates engaged in, among other things, numerous acts of violence and other crimes, including murder, robbery, extortion, and trafficking in narcotics.  WVL operated within the Central District of California.

2.   WVL, including its leaders, members, and associates, constituted an enterprise as defined by Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce.  The WVL enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3.   WVL, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving murder, in violation of California Penal Code Sections 31, 182, 187, 189, and 664, acts involving robbery, in violation of California Penal Code Sections 31, 182, 211, and 664, acts involving extortion, in violation of California Penal Code Sections 31, 182, 518, 519, 520,

23

and 664, and offenses involving trafficking in controlled substances, in violation of Title 21, United States Code, Sections 846 and 841.

4.   WVL was a multi-generational Hispanic street gang that originated in the late 1960s and was founded in the westside of Whittier, California.  WVL was formed, in part, so that its members could protect themselves from local rival gangs.  WVL had over 100 members.

5.   WVL was associated with the Mexican Mafia, commonly referred to as "la Eme" (which translates in English to "the M").  The Mexican Mafia was a criminal organization that operated within the California state prison system, the federal prison system, and the streets and suburbs of large cities throughout Southern California.  By controlling the criminal activities occurring within prison facilities, providing protection for imprisoned members and associates of Hispanic gangs, and imposing discipline, often in the form of acts of violence, against both individuals and street gangs that fail to adhere to its directives, the Mexican Mafia rose to the position where it exercised control over Hispanic street gangs operating throughout the southern half of the State of California.  Specifically, its individual members controlled one or more Hispanic street gangs, which served as the power base through which the Mexican Mafia members operated their individual criminal organizations.  In return for its integration into the Mexican Mafia, as well as payment of rent or "taxes" to the Mexican Mafia, WVL members received the Mexican Mafia's protection in the neighborhoods and in prison.

6.   WVL had a shot caller, a person responsible for overseeing WVL's activities.  WVL's shot caller was also responsible for

collecting extortionate taxes from anyone generating money through illegal activity in its territory, as well as remitting WVL's taxes to the Mexican Mafia member who controlled WVL.

7.    WVL claimed territory on the westside of Whittier with its borders of Beverly Boulevard to the north, Whittier Boulevard to the south, Pickering Avenue to the west, and Painter Boulevard to the east.  WVL members often sold narcotics at the Passport Inn, located at 11435 Whittier Boulevard, Whittier, California.  Although the Passport Inn is located within WVL's territory, WVL and Quiet Village ("QV") members used the Passport Inn to sell narcotics.  WVL members congregated near the 7-11 convenience store, located at 80001 Greenleaf Avenue, Whittier, California, as well as Lee Owens Park, located at 7930 Greenleaf Avenue, Whittier, California.  Both the 7-11 convenience store and Lee Owens Park are located in the city of Whittier, California, within WVL's territory.

8.    WVL marked its territory by spray painting, or tagging, to demonstrate control over its territory.  WVL members used numbers and letters for its gang, such as "WVL," "VL," and "23," because the letter "W" is the twenty-third letter of the alphabet.  The Washington Nationals baseball cap is WVL's official logo, because "W" (Whittier) is the emblem of the Washington Nationals Baseball team. WVL's gang color is black.  WVL members also tagged the letters of rival gangs and then crossed them out, in a show of disrespect to that rival.  Such cross-out tagging is also used as a challenge to those rival gang members and to communicate among members. Additionally, WVL members tag in their claimed territory to warn or instill fear in the community.

9.   WVL had an alliance with QV, another criminal street gang located in Whittier, California.  WVL had several violent rival gangs throughout Whittier, most prominently the Dead End Locos gang, Brown Brotherhood gang, and Whittier 13.  WVL members engaged in violence against rivals and those perceived to be rival gang members.

10.   WVL trended toward using the Internet and social media to communicate its gang affiliation, unlike past means of doing so, including tagging, tattoos, and distinctive clothing.  WVL recruited, communicated, and issued threats via social media platforms and video communication platforms, including Facebook, Instagram, YouTube, and Facetime.  WVL typically used the hashtag #23, "23," with "23" representing W in the alphabet.  WVL members could identify as WVL, mark its territories, disrespect rivals, including by going to a rival gang's territory and posting videos throwing WVL gang signs, and alert fellow members to the presence of law enforcement or rivals.

11.   As a source of revenue, WVL trafficked in narcotics, committed robberies and theft, and engaged in extortion.

12.   To instill fear in the community and protect its turf, WVL committed acts of violence, including acts involving murder, assault, robbery, and extortion.  To exact revenge in rival gang territory, WVL engaged in shootings.  WVL also committed shootings of rival gang members, sometimes in retaliation for murders of WVL members by rivals, sometimes to assert WVL dominance.  Shootings by WVL members maintained and increased position in WVL.

13.   WVL used a number of common signs and symbols.  As a hand sign, WVL members used the "WV" hand sign.  This is most commonly displayed by placing the index finger and middle finger up, similar

26

to holding up two fingers, with one hand, forming a "V", while the other hand holds up three fingers with the index finger, middle finger, and ring finger, forming a "W."

B.   PURPOSES OF THE ENTERPRISE

14.   The purposes of the WVL enterprise included, but were not limited to, the following:

a.   Enriching members and associates of WVL through, among other things, the control of, and participation in, the trafficking of controlled substances in WVL territory and elsewhere and the commission of robberies.

b.   Maintaining control over all WVL territory.

c.   Preserving, protecting, and expanding the power of WVL through the use of intimidation, violence, and threats of violence.

d.   Violently retaliating against rival gang members, perceived outsiders, or law enforcement who challenged WVL authority or attempted to encroach on WVL territory.

C.   THE MEANS AND METHODS OF THE ENTERPRISE

15.   The means and methods by which the members and associates of WVL conducted and participated in the conduct of the affairs of the WVL criminal enterprise included the following:

a.   Members and associates of WVL committed, attempted to commit, conspired to commit, and threatened to commit acts of violence, including murder and robbery, to preserve, protect, and expand WVL's criminal operations.

b.   Members and associates of WVL promoted a climate of fear through acts of violence and threats to commit acts of violence.

c.   Leaders of WVL disseminated rules and orders to be followed by all participants in the WVL enterprise.

27

d.  Members and associates of WVL engaged in the trafficking of controlled substances and firearms, committed robberies, and collected extortionate taxes to generate revenue for the enterprise.

D.  VIOLENT CRIME IN AID OF RACKETEERING

16.  On or about January 13, 2022, in Los Angeles County, in the Central District of California, for the purpose of gaining entrance to and maintaining and increasing position in WVL, an enterprise engaged in racketeering activity, defendant ROJAS, and others known and unknown to the Grand Jury, each aiding and abetting the other, attempted to murder victim J.R., in violation of California Penal Code Sections 31, 187, 189, and 664.

COUNT EIGHT

[18 U.S.C. §§ 924(c)(1)(A)(iii), 2(a)]

[DEFENDANT ROJAS]

On or about January 13, 2022, in Los Angeles County, within the Central District of California, defendant RONNY ROJAS, also known as ("aka") "Ronald Rojas," aka "Rowdy," and others known and unknown to the Grand Jury, each aiding and abetting the other, knowingly used and carried a firearm during and in relation to, and possessed the firearm in furtherance of, a crime of violence, namely, Violent Crime in Aid of Racketeering, in violation of Title 18, United States Code, Section 1959(a)(5), as charged in Count Seven of this First Superseding Indictment, and in so doing, discharged the firearm.

COUNT NINE

[18 U.S.C. §§ 1959(a)(5), 2(a)]

[DEFENDANTS ROJAS AND GARCIA]

1. Paragraphs 1 through 15 of Count Seven of this First Superseding Indictment are re-alleged and incorporated here.

2. On or about March 5, 2022, in Los Angeles County, within the Central District of California, for the purpose of gaining entrance to and maintaining and increasing position in WVL, an enterprise engaged in racketeering activity, defendants RONNY ROJAS, also known as ("aka") "Ronald Rojas" aka "Rowdy," and MARIA GARCIA, aka "Riah," aka "Bubba," and others known and unknown to the Grand Jury, each aiding and abetting the other, unlawfully and knowingly attempted to murder victim J.P., in violation of California Penal Code Sections 31, 187, 189, and 664.

COUNT TEN

[18 U.S.C. §§ 1959(a)(1), 2(a)]

[DEFENDANTS ROJAS AND GARCIA]

1.     Paragraphs 1 through 15 of Count Seven of this First Superseding Indictment are re-alleged and incorporated here.

2.     On or about March 5, 2022, in Los Angeles County, within the Central District of California, for the purpose of gaining entrance to and maintaining and increasing position in WVL, an enterprise engaged in racketeering activity, defendants RONNY ROJAS, also known as ("aka") "Ronald Rojas," aka "Rowdy," and MARIA GARCIA, aka "Riah," aka "Bubba," and others known and unknown to the Grand Jury, each aiding and abetting the other, unlawfully and knowingly murdered victim M.F., in violation of California Penal Code Sections 31, 187, and 189.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SOLORZANO]

On or about November 22, 2022, in Los Angeles County, within the Central District of California, defendant RAPHAEL SOLORZANO, also known as "Snoops," knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 3.14 kilograms, of methamphetamine, a Schedule II controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

[DEFENDANT GUZMAN]

On or about July 8, 2022, in Los Angeles County, within the Central District of California, defendant RICHARD GUZMAN, also known as "Psycho," knowingly and intentionally distributed at least five grams, that is, approximately 13.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT GUZMAN]

On or about July 15, 2022, in Los Angeles County, within the Central District of California, defendant RICHARD GUZMAN, also known as "Psycho," knowingly and intentionally distributed at least 50 grams, that is, approximately 54 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

[DEFENDANT GUZMAN]

On or about July 28, 2022, in Los Angeles County, within the Central District of California, defendant RICHARD GUZMAN, also known as "Psycho," knowingly and intentionally distributed at least five grams, that is, approximately 23.2 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT GUZMAN]

On or about August 12, 2022, in Los Angeles County, within the Central District of California, defendant RICHARD GUZMAN, also known as "Psycho," knowingly and intentionally distributed at least 50 grams, that is, approximately 55 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

[DEFENDANT SAXELL]

On or about October 6, 2022, in Los Angeles County, within the Central District of California, defendant DANIEL SAXELL, also known as "Blanco," knowingly and intentionally distributed at least 50 grams, that is, approximately 54.1 grams, of methamphetamine, a Schedule II controlled substance.

1          NOTICE OF SPECIAL FINDINGS

2     The allegations of Counts Five, Six, Ten, and Eleven of this

3  First Superseding Indictment are hereby re-alleged and incorporated

4  by reference as if fully set forth herein.

5     As to Counts Five and Six, defendant CHASE CARRILLO, also known

6  as ("aka") "Psycho":

7     1.   Was 18 years of age or older at the time of the offenses

8  (18 U.S.C. § 3591(a));

9     2.   Intentionally participated in an act, contemplating that

10  the life of a person would be taken or intending that lethal force

11  would be used in connection with a person, other than a participant

12  in the offense, and victim M.F. died as a direct result of the act

13  (18 U.S.C. § 3591(a)(1)(C);

14     3.   In the commission of the offense knowingly created a grave

15  risk of death to one or more persons in addition to the victim of the

16  offense (18 U.S.C. § 3592(c)(5)); and

17     4.   Committed the offense after substantial planning and

18  premeditation to cause the death or injury of a person (18 U.S.C.

19  § 3592(c)(9)).

20     As to Counts Ten and Eleven, defendant RONNY ROJAS, aka "Ronald

21  Rojas," aka "Rowdy":

22     5.   Was 18 years of age or older at the time of the offenses

23  (18 U.S.C. § 3591(a));

24     6.   Intentionally participated in an act, contemplating that

25  the life of a person would be taken or intending that lethal force

26  would be used in connection with a person, other than a participant

27  in the offense, and victim M.F. died as a direct result of the act

28  (18 U.S.C. § 3591(a)(1)(C);

7.    In the commission of the offense knowingly created a grave risk of death to one or more persons in addition to the victim of the offense (18 U.S.C. § 3592(c)(5)); and

8.    Committed the offense after substantial planning and premeditation to cause the death or injury of a person (18 U.S.C. § 3592(c)(9)).

As to Counts Ten and Eleven, defendant MARIA GARCIA, aka "Riah," aka "Bubba":

9.    Was 18 years of age or older at the time of the offenses (18 U.S.C. § 3591(a));

10.    Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and victim M.F. died as a direct result of the act (18 U.S.C. § 3591(a)(1)(C);

11.    In the commission of the offense knowingly created a grave risk of death to one or more persons in addition to the victim of the offense (18 U.S.C. § 3592(c)(5)); and

12.    Committed the offense after substantial planning and premeditation to cause the death or injury of a person (18 U.S.C. § 3592(c)(9)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.    Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 1963, and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offense set forth in Count One of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)   Any interest the convicted defendant has acquired or maintained as a result of any such offense;

(b)   Any interest in, security of, claim against, or property or contractual right of any kind affording a source or influence over, any enterprise which the convicted defendant has established, operated, controlled, conducted, or participated in the conduct of, as a result of any such offense;

(c)   Any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity as a result of any such offense; and

(d)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.    Pursuant to Title 18, United States Code, Section 1963(m), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof

40

(a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 981(a)(1)(C), 924(d) and 28 U.S.C. § 2461(c)]

1.     Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 924(d), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Two, Four, Five, Seven, Nine, or Ten of this First Superseding Indictment.

2.     Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses;

(b)   All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

(c)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Three, Six, Eight, or Eleven of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any firearm or ammunition involved in or used in any such offense; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the convicted defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

44

1                    FORFEITURE ALLEGATION FOUR

2          [21 U.S.C. § 853; 18 U.S.C. § 924; 28 U.S.C. § 2461(c)]

3          1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4    Procedure, notice is hereby given that the United States of America

5    will seek forfeiture as part of any sentence, pursuant to Title 21,

6    United States Code, Section 853, Title 18, United States Code,

7    Section 924, and Title 28, United States Code, Section 2461(c), in

8    the event of any defendant's conviction of the offenses set forth in

9    any of Counts Twelve through Seventeen of this First Superseding

10   Indictment.

11         2.   Any defendant so convicted shall forfeit to the United

12   States of America the following:

13              (a)  All right, title and interest in any and all property,

14   real or personal, constituting or derived from, any proceeds which

15   the defendant obtained, directly or indirectly, from any such

16   offense;

17              (b)  All right, title and interest in any and all property,

18   real or personal, used, or intended to be used, in any manner or

19   part, to commit, or to facilitate the commission of any such offense;

20              (c)  All right, title, and interest in any firearm or

21   ammunition involved in or used in any such offense; and

22              (d)  To the extent such property is not available for

23   forfeiture, a sum of money equal to the total value of the property

24   described in subparagraphs (a), (b), and (c).

25         3.   Pursuant to Title 21, United States Code, Section 853(p),

26   any defendant so convicted, shall forfeit substitute property if, by

27   any act or omission of said defendant, the property described in the

28   preceding paragraph, or any portion thereof: (a) cannot be located

                                   45

1  upon the exercise of due diligence; (b) has been transferred, sold

2  to, or deposited with a third party; (c) has been placed beyond the

3  jurisdiction of the court; (d) has been substantially diminished in

4  value; or (e) has been commingled with other property that cannot be

5  divided without difficulty.

6

7

8                                              A TRUE BILL

9

10                                       _____/S/_____

11                                            Foreperson

12  E. MARTIN ESTRADA
    United States Attorney
13

14

15  MACK E. JENKINS
    Assistant United States Attorney
16  Chief, Criminal Division

17  JEFFREY M. CHEMERINSKY
    Assistant United States Attorney
18  Chief, Violent and Organized
    Crime Section
19
    JEREMIAH LEVINE
20  Assistant United States Attorney
    Violent and Organized Crime
21  Section

22

23

24

25

26

27

28